[Crim. No. 512. In Bank.—June 16, 1899.]

THE PEOPLE, Respondent, *v.* J. I. HARRIS and GEORGE CARDWELL, Appellants.

CRIMINAL LAW—HOMICIDE—SELF-DEFENSE—DISPUTED RIGHT TO USE OF ROAD—OVERT ACT.—In case of a homicide occasioned by a dispute over the right to the use of a road across the premises of the deceased, where each of the parties was fully armed, and determined at all hazards to maintain his claim, the question of self-defense is independent of the respective rights of the

parties to the road; and the one who by some overt act first caused a reasonable apprehension of danger of loss of life or limb to the other, must take the consequences.

ID.—CONVICTION OF MANSLAUGHTER—SUPPORT OF VERDICT.—Where there is evidence, in such a case, from which the jury might find that, at the time of the killing, the deceased had committed no overt act which justified the killing, a verdict convicting the defendants of manslaughter will not be disturbed upon appeal.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. B. N. Smith, Judge.

The facts are stated in the opinion of the court.

R. A. Ling, and Frank F. Davis, for Appellants.

Tirey L. Ford, Attorney General, and A. A. Moore, Jr., Deputy Attorney General, for Respondent.

GAROUTTE, J.—Defendants have been convicted of manslaughter, and appeal from the judgment and order denying their motion for a new trial. It is insisted that the evidence shows a case of justifiable homicide. The facts, briefly stated, are as follows:

The deceased, by a wire fence, closed a road extending across his premises. Two of his neighbors, these defendants, claimed the right to travel upon this road. Ill-feeling arose, and deceased informed them that if they attempted to pass over the road he would kill them. Some days thereafter the defendants in a wagon, armed with shotgun and rifle, a third man driving the horses, started to travel over the forbidden road. They cut the wires of the fence, passed on, and as they approached the house of the deceased he left his plow standing in the field, went to the house, and reappeared with his rifle in his hands. At this time defendants were about two hundred feet distant. They continued upon their way, one or both of them upon the ground by the side of the wagon, each with a gun in his hand; the deceased started from the house, angling toward a large tree which stood some distance in front of defendants and near the road. There is evidence that at this point of time defendants ordered deceased to stop and to drop his rifle. There is also evidence that deceased, at about the same time, ordered de-

fendants to turn and retrace their steps. As deceased was about to pass from the view of defendants behind the tree, and some nineteen feet distant therefrom, they fired at him, and he fell upon the ground dead. This point was sixty-five feet distant from the wagon. The position in which deceased held his rifle at the time he was killed is not clearly disclosed. Yet from the evidence the jury would have been justified in saying that it was not pointed toward defendants.

From the foregoing evidence the jury had the right to declare that this affray arose between three desperate, determined men; that these defendants began their journey with the intention to travel over the premises of the deceased at all hazards, and that deceased, when he saw them, intended to stop them at all hazards. Upon such a state of facts any question, legal or equitable, as to the respective rights of these parties in the road, becomes wholly immaterial. In this regard the case is similar to *People v. Conkling*, 111 Cal. 621, where the court said: "If it be assumed that at the time of the killing deceased was at the opening in the fence for the purpose of preventing the defendant at all hazards from going through, and if it also be assumed that defendant was there intending to pass through at all hazards, still the question of self-defense is presented to the jury, regardless of the respective rights of the parties to the road. Under such circumstances, the man who began the deadly affray —that is, who by some overt act caused the other as a reasonable man to believe that he was in danger of loss of life or limb —placed himself without the protection of the law and must take the consequences, whether those consequences be his death upon the ground, or the penalty imposed after trial by judge and jury."

Looking at this picture formed from the evidence, we deem the showing made ample to support the verdict. We see but little difference, viewed with the eyes of the law, in the relative positions of these three persons at the moment prior to the shooting. While, if the positions had been reversed and deceased at that moment had fired and killed the defendants—and such killing would have been manslaughter or worse—still it does not follow that defendants may not be guilty. Certainly, if the purpose of deceased was to place himself in the road in

front of defendants and thereby try and stop them from proceeding further on their way, and his rifle was lying upon his arm, not pointed in the direction of the defendants, then they had no right to shoot when they did; for there was no overt act by deceased at that time which justified them in taking his life. Under the evidence, the jury were authorized in declaring the conditions to be such as here suggested. The theory of defendants probably was that deceased was about to use the tree for a barricade, and, safely esconced behind it, shoot them down. Yet the deceased could well have used his house for that purpose and never have ventured into the open at all. These things were all matters for the jury to weigh and gauge and reason upon, and matters upon which their conclusion cannot be set aside by this court. As already suggested, from the evidence the jury had a right to say that these three men were within a few hundred feet of each other, in plain view, guns in their hands, fingers upon the trigger, enmity and deadly determination in their hearts. The jury had the right to say that at this time they all stood upon common ground, and that the light of the law shone upon all alike. An overt act at this critical period was bound to cause a tragedy; and the jury were justified in saying under the law and the facts that the defendants should not have fired the fatal shots.

We have examined the instructions given and refused, and find nothing demanding a reversal of the judgment. There is no error in the record.

For the foregoing reasons the judgment and order are affirmed.

Van Dyke, J., Harrison, J., McFarland, J., Henshaw, J., and Temple, J., concurred.

BEATTY, C. J., dissenting.—I dissent. The claim upon the part of appellants that the verdict of the jury was against the evidence cannot be upheld. There was clear proof of a voluntary killing, from which the law raised a presumption of malice. To rebut this presumption the burden of proving self-defense devolved upon defendants, and, since the jury were not bound to believe the testimony of their witnesses, it cannot be said, as matter of law, that the verdict is without evidence to sustain it.

I cannot, however, agree with the view of the evidence taken in the opinion of the court, wherein it seems to be held that even if it is accepted as true it does not make out a case of self-defense.

The road in question was one which had been used by the defendants and others for years, and was the only means of ingress and egress to and from the valley for loaded wagons. The deceased, when he came to live on the place where he was killed, found the road open and in common use across the public land upon which he was merely a settler, and the evidence shows without contradiction that he sought and obtained the consent of his neighbors, including these defendants, to inclose this road upon the express condition that he should construct a new road outside of his inclosure in all respects as good as the old road. In pursuance of this agreement he put a wire fence across the old road, and made a pretense of constructing a new one, but the evidence, which is wholly uncontradicted, abundantly shows that the new road was impassable for loaded wagons. It was with difficulty that half a load could be hauled over it, and defendants and others were obliged to make two trips to bring in one load. The defendants could not market their produce or obtain supplies for their families. Under these circumstances, they announced to deceased their intention to resume the use of the old road, whereupon he plainly told them that he would kill any man who attempted to pass that way.

Emphasis was imparted to this threat by the notoriously bad character of deceased. The evidence shows abundantly and without contradiction that he was a quarrelsome, turbulent, and dangerous man, always armed and ready on every occasion to resort to violence. The defendants, on the contrary, were shown to have been men of quiet and peaceable disposition. This, then, was the situation of affairs: The defendants, by the wrongful act of the deceased, were shut off from the only practicable road by which they could take their produce to market or bring in supplies for their families. They were in urgent need of relief; they had a clear legal right to travel over the old road; the obstructions erected by deceased constituted a public nuisance, which they were authorized to abate, but they were warned by deceased that their lives were to be the forfeit if

they attempted to exercise their rights. What were they to do? They had the choice to submit to a lawless invasion of their rights, or to assert them. They chose the latter alternative, and, in my opinion, made the proper and manly choice. Nor are they to be blamed for going armed if their only intention was to defend themselves against a felonious assault, and there is not a particle of evidence that they intended to make any other use of their arms. The open threats of deceased, his notorious bad character, and his constant state of preparation for deadly hostilities, warranted the apprehension that they might be called upon to defend their lives, and his subsequent conduct justified their precautions.

They entered upon the road without any breach of the peace, and when deceased saw them he left the field where he was at work, proceeded directly to his house, without saying a word, armed himself with a repeating rifle and made for the secure shelter of a large live-oak tree. But one construction could be put upon his conduct, and that was that he was seeking a position from which he would hold the others at his mercy, and no reasonable man could have avoided the conclusion that their lives were in imminent danger. He was shot when he had only six feet to go to shelter himself behind the tree, and after he had been repeatedly warned to stop by the defendants, according to the testimony of their witnesses. The wife of the deceased, the only other eye-witness of the affair, testified that she had heard no such warning, and to this extent and upon this point alone the evidence is conflicting. Upon the evidence, therefore, assuming it to be true, I consider the plea of self-defense to have been well sustained. But, as above stated, there was against this evidence a legal presumption of malice, from the voluntary killing; and, upon the theory that the jury discredited the testimony for the defense, the verdict may be upheld.

I see no reason, however, why the evidence for the defense should have been discredited. So far as it appears upon the record, the witnesses were fair and disinterested, as they were wholly unimpeached. Their testimony makes out a case in which the deceased, a bad and dangerous character, was grossly in the wrong, in which he was clearly the aggressor, and in which the defendants, while peaceably exercising their legal rights, were forced to defend their lives.

Such being the case I think we are justified in scrutinizing closely the instructions of the court on the law of self-defense in order to discover whether they were as full and clear and explicit as the defendants had a right to demand.

As to most of the charge of the court there is no criticism to make, but there were three instructions proposed by the defendants in which the jury were told that if they believed certain facts to have been established, then the killing was justifiable, and they must acquit the defendants. It is conceded that these instructions were correct as framed, but the court modified each of them by substituting, for the direction to acquit, the formula that (in the case supposed) the defendants "had the right to defend themselves even to the taking of the life of Hilton." This action of the court is defended upon the ground that the instructions meant just the same thing after the alteration as before. It is perhaps true that they do mean, to a lawyer, just as much in one form as in the other, but evidently the judge of the superior court thought that in their modified form they would carry some different meaning to the jurors, else why should he take the trouble to make the change? The question for the jury was, What should be their verdict? In the instructions as prayed they were told, and correctly told, that their verdict, in view of certain supposed facts, should be not guilty; in the altered form of the instructions they were merely told that on the same state of facts the defendants had a right to defend themselves even to the extent of taking life. It is true that to any lawyer, and probably to most laymen, the conclusion from this proposition would appear inevitable that the defendants should be acquitted. But why, when an instruction is properly framed, and states the proper verdict to be rendered upon the hypothetical case, should the court emasculate it by striking out the conclusion and substituting in its place a proposition from which the conclusion can only be inferred?

I think the defendants should have a new trial.